FILED

DEC 02 2019

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LUIS ALBERTO GARCIA and
ERIC JASPER LEBEAU,

Defendants.

CR 19–20–BU–DLC

ORDER

Before the Court are the Motions to Suppress filed by Defendants Luis
Alberto Garcia (Doc. 32) and Eric Jasper LeBeau (Doc. 29). The Court held an
evidentiary hearing on the issues presented in the motions on November 20, 2019.
Having considered the parties' arguments and the evidence offered in support of
their briefs and at the hearing, including a dashboard camera videorecording of the
traffic stop, the Court grants the motions.

## BACKGROUND

### I. The Traffic Stop

On the morning of May 31, 2019, Garcia and LeBeau caught a ride from a
gas station attendant who had just finished a night shift at the Town Pump in Four
Corners, Montana. The men rode in the open bed of the attendant's pickup as she

1

drove into Belgrade, where Garcia and LeBeau anticipated finding a room at a local hotel.

Montana Highway Patrol Trooper Tyler Brant was traveling in the same direction as the pickup, heading north on Jackrabbit Lane, a four-lane highway, when he saw Garcia and Lebeau in the back of the truck. He flipped on his lights and siren to pull the driver over. It is unclear why he initiated the stop. At the time he told Garcia, LeBeau, and the driver that he pulled them over because no one was sitting in the passenger seat and all seatbelts must be in use before a passenger can ride in the bed of a pickup.[1] In his police report, he wrote that the driver's choice "put her passengers at substantial risk of serious bodily injury or death," and that she therefore committed the crime of negligent endangerment in violation of Montana Code Annotated § 45–2–208. (Doc. 30-5 at 4.) In his police report, he added that the rate of speed of the truck—55 m.p.h.—was dangerously fast for the men in the bed of the truck (Doc. 30-5 at 4), but he also wrote in a search warrant

---

[1] Under Montana law, "[a] driver may not operate a motor vehicle upon a highway of the state of Montana unless each occupant of a designated seating position is wearing a properly adjusted and fastened seatbelt." Mont. Code Ann. § 61-13-103(1). Because the statute does not require passengers to be "occupant[s] of . . . designated seating position[s]," the Court does not share Trooper Brant's interpretation of the statute. *But see Heien v. North Carolina*, 574 U.S. 530 (2014) (providing that reasonable suspicion may justify a traffic stop even if the stop is predicated on an erroneous but reasonable interpretation of law). Even if Trooper Brant's construction is reasonable, however, the seatbelt statute unequivocally provides that noncompliance does not justify a traffic stop unless there is "reasonable cause to believe that the driver has violated another traffic regulation or that the driver's vehicle is unsafe or not equipped as required by law." Mont. Code Ann. § 61-13-103(3)(a).

2

application prepared the day of the traffic stop that the vehicle "pose[d] a safety hazard" because it was "traveling slower than the average flow of traffic [at 70 m.p.h.]"[2] (Doc. 30-6 at 3.) At the hearing, Brant admitted that he was not thinking of negligent endangerment at the time of the traffic stop and stated an additional possibility, that he was motivated by his concern that the two men posed a threat to the driver.

LeBeau smiled and waved at Trooper Brant (or perhaps the dashboard camera) as the officer exited his patrol car. Garcia, whose facial features are obscured by elaborate black tattoos, pulled his hood up over his hat and appeared rather less interested in having a conversation with the officer. Both men, though, appeared calm and polite. Brant spoke with the driver briefly and took her driver's license.

Trooper Brant then asked Garcia and Lebeau for their licenses, and Garcia said that they didn't have them. Lebeau added, "We don't have our IDs. Stolen." Trooper Brant asked, "Stolen? Both of them?" and Lebeau responded, "No, just

---

[2] In the warrant application, Trooper Brant also writes that "[t]he vehicle was travelling through a construction zone at the time with heavy equipment parked on the side of the road." (Doc. 30-6 at 3.) In the video, traffic cones can be seen in the shoulder of the other side of the four-lane highway, but there is no other indication that the pickup is moving through a construction zone.

my wallet."[3]  Trooper Brant asked the men for their full names and dates of birth, and they gave complete and honest responses.

Trooper Brant told the men that he stopped them because "[j]ust one of you guys needs to be sitting in the passenger seat with her.  Cause all the seatbelts need to be taken up.  That's all it is, so we'll be out of here real quick though."  This exchange occurred less than three minutes into the stop, but the men were not, in fact, free to leave for over an hour and a half.

Trooper Brant returned to his patrol car to contact dispatch and request backup.  He did not ask for any information regarding the driver of the vehicle but focused immediately on the men in the back, asking for information about Garcia first and then LeBeau.  Garcia and LeBeau were within view of the dashboard camera, and they look relaxed as they chat with each other in the bed of the truck. LeBeau lit his first cigarette about seven minutes into the stop.

Approximately eight minutes in, the dispatch officer informed Trooper Brant that Garcia is listed as a "known criminal gang member" and is currently under supervision.  Because the dispatch officer could not immediately locate LeBeau in the system, Brant asked LeBeau for follow-up information, which LeBeau gave honestly.  Trooper Brant then began questioning the men about why they were in

---

[3] Throughout this Order, quoted dialogue derives either from documentary evidence provided by the parties—in which case, a record citation is given—or the Court's own transcription of the traffic stop video—in which case, there is no citation to the record.

Montana and how they got there. They agreed that they were both from North Dakota (which appears to be accurate) and that they were "just visiting." When Brant returned to the patrol car to attempt to find more information, LeBeau lit a second cigarette.

Additional officers, Trooper Taylor Gagnon and Deputy Collin Kiewatt, arrived on the scene shortly thereafter. Trooper Brant told them that he intended to separate the men so that they could be questioned individually. Garcia, who was talking on his cell phone at this point, lit a cigarette, his first. The officers agreed that they "[would] bring them both out, search for weapons," leaving two backpacks in the back of the pickup.

Trooper Brant and Deputy Kiewatt walked back to the bed of the pickup. Lebeau asked, "We good now?" to which Brant replied, "No, yeah, we're good. All I wanna do—do you guys have any weapons on you or anything like that?" They said no, and Trooper Brant said, "Sounds good. You guys mind just hopping out just so I can check and verify that." When Lebeau asked, "Are we being detained or something, or . . . ," Brant responded, "We just want to do our checks. That's all." The men exited the pickup, LeBeau holding a large fountain soda and Garcia with a cigarette and cell phone in hand.

Trooper Brant and Deputy Kiewatt patted the men down. Brant located a bag in the pocket of Garcia's hoodie, which Garcia identified as his diabetic kit,

5

and Brant placed it on the hood of his patrol car. The officers did not find weapons or evidence of crime during the pat-down searches.

About fifteen minutes into the stop, the driver got out of her vehicle, presumably to see if she could leave. Trooper Brant asked her to return to the pickup, and he walked back to the driver-side window to speak to her for the first time since initiating the traffic stop. The driver's voice cannot be heard clearly in the recording, except to say that the men seemed "really polite." At the evidentiary hearing, Brant testified that the driver told him that the men had been at the Town Pump all night. He also stated that she volunteered to have one of them ride with her in the cab of the truck to come into compliance with Brant's construction of the seatbelt law.

Trooper Brant told the driver that he would be applying for a search warrant to search the backpacks in the back of the truck. He reassured that he would "do [his] very best to try and get [her] out of there." He then returned to his patrol car to call in a canine unit. He asked Garcia more questions about why he and LeBeau were in Montana and how they got there. Garcia said they came to the Bozeman area to visit a friend and that both he and LeBeau are from North Dakota. Brant went on to ask Garcia extensive, detailed questions about their travel history and intentions in Montana. He immediately moved to LeBeau, who could not hear the exchange between Brant and Garcia, to ask the same questions. LeBeau asked if

6

Brant had a warrant, and Brant said no. Trooper Brant questioned LeBeau at length about how he and Garcia got to Bozeman. LeBeau asked, "Are we being detained?" to which Brant responded, "Yes. Yeah."

LeBeau wondered why they were being detained, and Trooper Brant answered, "I'm suspecting you guys of possibly drug trafficking." LeBeau asked what kind of drugs Brant suspected of them of trafficking and Brant said that he was unsure. Brant then returned to the line of questions regarding the pair's recent travel history and future plans. LeBeau gave answers that presented some inconsistencies with Garcia's account; while Garcia said that the men came from North Dakota, LeBeau informed Brant that they were from North Dakota but were coming to Montana from a job in Utah. LeBeau then told Brant that he meant "no disrespect" but did not believe he wanted to answer any more questions.

Around this time, although he remained fairly calm and polite, LeBeau started to signal distrust toward Trooper Brant. He asked, "Do you do this to everybody?" Brant answered, "No, I don't do this to everybody. So here's the deal, all I stopped you for is you guys were sitting in the back of the truck." LeBeau apparently disagreed, suggesting that Brant's true motivation was "Because he's got a bunch of tattoos on his face." Brant objected, saying, "No, not because he's got a bunch of tattoos on his face. Because we need to have all the seatbelts occupied." LeBeau didn't buy it. He asked, "Well then how you're

7

going to come to drug trafficking?" Brant said that it was because of inconsistencies in the travel histories given by each of the men.

Trooper Brant immediately turned his attention to the bags in the back of the truck: "Anything in those bags I should be concerned about?" LeBeau said no, and the exchange continued:

Brant:      "Drug paraphernalia?"

LeBeau:   "No."

Brant:      "Any marijuana?"

LeBeau:   "I don't smoke marijuana"

Brant:      "That's not an answer to my question. I'm just asking is there any marijuana?"

LeBeau:   "No. There's nothing."

Brant:      "Any meth inside those bags?"

LeBeau:   "No."

Brant:      "Okay. Any heroin?"

LeBeau:   "Come on."

Brant:      "I'm just asking the question. Any heroin inside those bags or anything like that?"

LeBeau:   "Yeah, I got some heroin up my ass."

Brant:      "You got some heroin up your ass right now?"

LeBeau:   [laughing] "No I don't. I don't have any heroin."

8

Brant:     "I'm telling you right now. This is not a time to joke around with me."

LeBeau:    "There's no heroin."

Brant:     "Okay. Do I have permission to search those bags?"

LeBeau:    "You don't have permission to search anything."

LeBeau went on to tell Trooper Brant that Deputy Kiewatt "never patted me down that good" and that "now [LeBeau's] thinking it's because [Garcia] has a bunch of tattoos on his face." Brant disagreed:

> It's not because he has a bunch of tattoos on his face. . . . It's suspicious behavior to have you guys come over here from—no, listen to me—to have you guys come over here from North Dakota. I get that you're telling me you came up from Utah and maybe he forgot to mention the Utah part, okay? . . . You don't have a vehicle. I don't know why you guys are up here. You guys are hanging around the Town Pump.

After further colloquy between Trooper Brant and LeBeau, Trooper Brant said, "Here's the deal. Right now you guys are being detained, okay? You guys are not under arrest at this point but you are being detained, okay?" Approximately twenty-six minutes into the stop, LeBeau was handcuffed and seated in the backseat of the backup police car. If there is a recording of LeBeau when he is seated in the other car, the Court has not seen or heard it.

Trooper Brant then turned his attention to Garcia: "Mr. Garcia. You're not under arrest at this point. I just want to detain you guys, okay? I'm just going to sit you guys in the back seat of my patrol car right now, okay?" Garcia was placed

9

in the back of Trooper Brant's car, where he asked, "Not under arrest though, right?" Brant affirmed, "Not under arrest, no. Just detaining you. . . . Just detaining you guys because I'm suspecting there might be some criminal activity going on right now."

About twenty-eight minutes into the stop, Trooper Brant appeared to remember that he told the driver he would try to release her. He asked Garcia if he could take the backpacks out of the pickup and set them down on the roadside. He said, "If everything checks out with you guys, I'd be willing to give you a ride to the hotel." Garcia clarified: "Well, if we're not under arrest, I mean?" When Brant responded, "You're not under arrest right now," Garcia pointed out, "We're in handcuffs and we're in the back of the car." Brant said, "I hear you. You're just being detained for my investigation. You're not free to leave at this point." He continued to ask for Garcia's consent to take the bags out of the pickup so that the driver could move on. Garcia told Brant that Brant should attempt to get consent from LeBeau because "I don't understand why you guys are doing what you're doing."

Trooper Brant then exited the car so that he could ask LeBeau for consent to search the bags. LeBeau remained calm, but he made it clear that he believed Brant was acting out of prejudice toward Garcia (and, to a lesser extent, himself) rather than in response to objective information. LeBeau said, "You haven't even

10

checked my pockets. I have to infer that you don't even think I'm doing anything wrong. . . . I don't know what's going on here." He would not consent to a search of the backpacks: "I refuse to let you search my person or the vehicle just because . . . I don't think you're being fair." He asked Brant whether Brant thought that LeBeau was on drugs; Brant admitted that he did not. LeBeau pushed further into Brant's motivation for the stop and the request to search: "I think you're doing it because he's got tattoos on his face. . . . and I think that's the only reason. If it had been two white boys sitting in the back, you would not have stopped."

That time, Trooper Brant did not attempt to disagree with LeBeau. Rather, he turned his attention back to the bags in the bed of the pickup. The men would not consent to a search or allow Brant to take the bags out of the truck; LeBeau suggested that the bags may, in fact, belong to the driver. Brant asked the other officers to keep an eye on Garcia and LeBeau while he returned to speak to the driver of the pickup. About Garcia, whom Trooper Brant has already searched, he said, "I think he's probably got something on his person."

Over thirty minutes into the stop, Trooper Brant reinitiated conversation with the driver, who told him that the backpacks belonged to the men. Because she was coming off of a night shift and because she had promised a ride to her daughter, the driver was anxious for the traffic stop to end. Trooper Brant told her that if she would like to leave, she could take the backpacks out of the vehicle and

leave them on the side of the road. She felt she needed to leave but she signaled that she was conflicted, saying that she "feel[s] bad for them" because "they seem so nice."

Thirty-five minutes into the stop, Trooper Brant finally asks dispatch to look into the driver. Less than five minutes later, Brant gave the driver a written warning, pointing out a crack in the windshield, and sent her on her way.

Trooper Brant continued to investigate Garcia and LeBeau while waiting for the canine unit to arrive on the scene. Forty-six minutes into the stop, Brant *Mirandizes* Garcia, who informed him that he would like to exercise his right to silence. Garcia then sought clarification about whether he and LeBeau were now under arrest. Brant replied, "You're not under arrest. You're being detained, though. . . ." At around this time, Brant learned that, although both Garcia and LeBeau had extensive criminal history relating to guns and drugs, neither man was subject to an active warrant.

About fifty minutes into the stop, Brant decided to conduct a "more thorough" search on LeBeau to ensure that he did not have any concealed weapons. LeBeau agreed to the search because he did not believe he could refuse consent, saying: "And if I don't want to oblige anymore? You're going to take me down to the ground and do it anyway. So I better oblige." Brant responded, "There you go."

Almost one hour after initiating the traffic stop, Trooper Brant ignored Garcia's invocation of his *Miranda* rights and returned to his line of questioning regarding how the men ended up in Montana. He asked, "Did you guys come here straight from North Dakota?" Garcia asked Brant what LeBeau had told him, and Brant responded, "What do you mean, what did he tell me? I'm just asking if you guys came straight here from North Dakota." Garcia said, "I'd like a lawyer. . . . There's too many questions for not being under arrest, know what I'm saying? We're just trying to visit a friend and we're being accused of whatever kind of activities you said."

An hour and fourteen minutes into the stop, the canine unit arrived. Trooper Brant filled Gallatin County Deputy Doug Lieurance in: "Two guys sitting in the back of a pickup. Pull them over for not occupying the front passenger seat. It was empty. . . . I asked why they were here; they said they'd come from North Dakota. One said they came from North Dakota; the other said they came from Utah. . . . They had bags. They both had long extensive criminal histories."

Trooper Brant placed Garcia's diabetic kit on the ground next to the backpacks. Deputy Lieurance asked which bag belonged to which man; Brant was unsure. Although it was not initially clear whether Deputy Lieurance's dog, Miles, had alerted on all or only one of the bags, Deputy Lieurance ultimately determined that Miles had positively alerted on all three. At this point, Trooper Brant

13

determined that he could no longer justify detaining the men but that he would retain the backpacks while he prepared a search warrant on the basis of the dog sniff. Brant released the diabetic kit to Garcia after searching it.

At 9:54 a.m., over an hour and a half after it started, the traffic stop finally concluded. (Doc. 30-5 at 8.) Trooper Brant immediately went to the station to begin an application for a search warrant for the backpacks. (Doc. 30-5 at 8.)

## II.   The Yellowstone Accident

While Miles was sniffing the backpacks on the side of Jackrabbit Lane, Yellowstone National Park Ranger Katy Wilkinson also called Deputy Lieurance for a drug sniff. At approximately 10:30 a.m., as Ranger Wilkinson explained the situation to Deputy Lieurance, he realized that her descriptions of the individuals involved in a traffic accident in Yellowstone the evening before matched those of Garcia and LeBeau. (Doc. 30-3.) A photo taken of LeBeau in Yellowstone, coupled with Garcia's face-covering tattoos, provided confirmation that the same men had been involved.

Unbeknownst to Brant and Lieurance when they released the men, Garcia and Lebeau had been passengers in a traffic accident in Yellowstone only the day before. The apparent driver of the car in which they'd been traveling, Jesse Keller, had the misfortune of veering out of his lane and into that of an off-duty police officer, striking the officer's GMC Yukon with his Buick Regal. (Doc. 30-1.)

14

The off-duty officer told the responding Park Rangers that two men had run out of the Buick with bags and packages in hand and that one or both of the men had MS 13 tattoos.[4] (Doc. 30-1 at 3; 30-4 at 3.)

Keller remained on the scene but proved unable to provide much in the way of helpful information. He gave responding Park Ranger A. La Bolle inconsistent stories about: who owned the Buick (either he did, or one of the passengers did, or he did but was in the process of selling it to one of the passengers); the passengers' names (both unknown, one unknown and the other "Lez," or "Pete" and "Jay"); who was driving when the accident occurred ("It was so beautiful that I was taking pictures with my iPad as I was driving," "he was sleeping"); and how long he knew "Pete" and "Jay" ("they fixed my Buick a long time ago," he'd "only been with them a few days," he'd known "Jay" for about "four weeks"). (Doc. 30-1.) Keller was arrested, presumably for driving with a suspended license, and the Buick was seized. (Doc. 30-1.) Ultimately, the car was searched, and officers found: ziplock baggies; a butane torch; two matching North Dakota license plates registered to the Buick[5] in someone else's name and wrapped in a blanket; and an atlas, "with a route marked from around Coachella[,] California, in the south of the

---

[4] As mentioned previously, Garcia has extensive facial tattoos. It is unclear which, if any, of these tattoos signal membership in MS 13 or any other criminal gang.

[5] The North Dakota license plates on the vehicle were registered in Keller's name to a Buick Regal of the same year but a different color.

state[,] . . . then traced through Yellowstone National Park . . . and terminated past the Montana border. In South Dakota, the town of 'McIntosh' [wa]s written on the map." (Doc. 30-1 at 4.)

### III.   The Arrest and Search

With their newly discovered knowledge of the Yellowstone accident and the understanding that Ranger Wilkinson would apply for arrest warrants now that she knew the identity of the Buick's passengers, Deputy Lieurance and Trooper Brant immediately began traveling in the direction Garcia and LeBeau had left on foot. They found the men at the Quality Inn, just south of Belgrade on Jackrabbit Lane, and arrested them at 10:45 a.m., less than an hour after the traffic stop concluded.

LeBeau and Garcia were brought immediately to the Gallatin County Detention Center. Although a warrant had not issued and Trooper Brant testified at the hearing that he had not searched the backpacks, in which a gun would ultimately be found, LeBeau was booked on a charge of unlawful possession of a firearm. (Doc. 44.)

The men's arrest warrants, signed by the United States Magistrate Judge for Yellowstone National Park, were faxed to Trooper Brant at approximately 2:45 p.m., after the dog sniff but before the search warrant was issued. (Doc. 30-2.) The offense listed on LeBeau's warrant was possession of a controlled substance.[6]

---

[6] The Court has not reviewed Garcia's warrant.

(Doc. 30-2.) Trooper Brant served the warrants on Garcia and LeBeau, who were already in jail, and returned to the office to complete his application for a warrant to search the backpacks. (Doc. 30-5 at 9.) He described the traffic stop and stated that there was probable cause because: (1) Garcia's "numerous facial tattoos" are "associated with potential gang affiliation and narcotics activity"; (2) "Lebe[au] lit a fresh cigarette," and "smoking a freshly lit cigarette when one is being pulled over by law enforcement can be used to mask odors or can be a coping behavior by persons under stress"; (3) both men had prior criminal history involving drugs; (4) Trooper Brant "found the two men's statemen[ts] to be conflicting," and "individuals who are unable to tell the same story in regard to their travels may be involved in criminal activity and in particular illegal drug activity"; (5) Miles gave a positive alert, indicating that one of the bags held drugs; and (6) Garcia and Lebeau "were suspects in a hit and run crash the evening of May 30, 2019," and the "Park Service wanted both men arrested and transported . . . pending an arrest for Possession of a controlled substance." (Doc. 30-6 at 5–8.)

Montana District Court Judge John Brown signed the search warrant at 5:05 p.m. Trooper Brant immediately effectuated a search. (Doc. 30-5 at 9.) The blue Nike backpack held a loaded handgun and $9,000 in counterfeit $100 bills, which were apparently fairly convincing, as it took days to discover their inauthenticity.

(Doc. 30-5 at 9.) The gray Champion backpack contained 1.16 pounds of methamphetamine. (Doc. 30-5 at 9.)

## DISCUSSION

In their motions, Garcia and LeBeau request suppression under any of three bases: (1) the warrantless seizure of the men and then their backpacks violated the Fourth Amendment; (2) the men were arrested without a warrant or an exception to the warrant requirement; and (3) the search warrant for the backpacks was not supported by probable cause. At the hearing, the evidence suggested a possible fourth—that Trooper Brant ought not to have pulled the truck over in the first place—and at least a hint of a fifth—that *Miranda* was violated by: the failure to timely *Mirandize* Garcia; the failure to *Mirandize* LeBeau during the traffic stop at all; and Trooper Brant's refusal to accept Garcia's assertion of his *Miranda* rights. While each of these issues appears to be, at minimum, a plausible route to partial or complete relief, the Court, like Garcia and LeBeau, focuses on the first theory of relief, which is dispositive as to both defendants.

The Court assumes, *arguendo*, that Trooper Brant did not violate Garcia's and LeBeau's constitutional rights simply by initiating the traffic stop. *See supra* n.1. "A seizure for a traffic violation justifies a police investigation of that violation. '[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called "*Terry* stop" . . . than to a formal arrest." *Rodriguez v. United States*,

18

135 S. Ct. 1609, 1614 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)) (alterations in original). "For the duration of a traffic stop, . . . a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (quoting *Brendlin v. California*, 551 U.S. 249, 251 (2007)). This is necessarily true even where only the driver can reasonably be suspected of unlawful behavior. *Id.* Because traffic stops are "especially fraught with danger to police officers," *Michigan v. Long*, 436 U.S. 1032, 1047 (1983), officer safety may outweigh "*de minimis*" intrusions, such as requiring a driver or passengers to exit the vehicle, *Johnson*, 555 U.S. at 331 (quoting *Pennsylvania v. Mimms*, 434 U.S. 406, 110–11 (1977) (per curium)).

However, an officer's discretion to conduct investigations during a traffic stop is not unlimited. "The scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614. While an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

Where, as here, a traffic stop is initiated for an apparent violation of highway safety laws, the officer may take measures, "close[ly] connect[ed] to roadway

19

safety," to ensure that "vehicles on the road are operated safely and responsibly." *Id.* Such measures do not extend to dog sniffs, which are "aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). The Supreme Court has clearly held that an officer may not extend a traffic stop for the purpose of conducting a dog sniff absent reasonable suspicion of criminal activity. *Id.* at 1616.

The question here, then, is whether Trooper Brant had reasonable suspicion to detain Garcia and LeBeau past the point of issuing a warning to the driver and determining that neither was subject to a warrant. Considering the universe of information available to Brant (and even inventing justifications for the detention beyond those articulated by Brant), the Court considers whether the totality of the circumstances gives rise to reasonable suspicion of criminal activity justifying an hour-and-a-half-long traffic stop. Supporting the detention are: Garcia and LeBeau's presence in the bed of the pickup, their criminal histories, Garcia's status as a "known criminal gang member," the men's use of cigarettes, Trooper Brant's belief that the men told conflicting histories about how they got to Montana, the drivers' report that Garcia and LeBeau had spent the night at the Town Pump, the existence of the backpacks, and the fact that the men were traveling without a vehicle.

Taken together, these bits of information cannot authorize the continued detention of Garcia and LeBeau and the dog sniff performed on the backpacks. Aside from the arguably contradictory answers the men gave to Trooper Brant's questions, Brant had little more than "prefabricated or recycled profile[s] of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." *United States v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992). Perhaps, under the totality of the circumstances, a reasonable officer would be alert to the possibility that Garcia and LeBeau were— as they ultimately proved to be—up to no good. However, even where a brief investigation is authorized, "[i]f the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). Despite Brant's unrelenting attempts to elicit incriminating testimony from Garcia and LeBeau, their "answers [did not] provide the officer with probable cause to arrest [them]." *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984).

Trooper Brant extended the traffic stop long past the point of a brief investigation into the possibility of criminal wrongdoing. At minimum, Garcia and LeBeau ought to have been free to leave when dispatch gave the all-clear. And they ought to have been able to take their backpacks with them, as there was insufficient justification for their continued detention pending the dog sniff.

21

Subtracting Miles's positive alert on the bags, there can be no reasonable argument for probable cause to search the backpacks because the only information available to Trooper Brant was that which the Court finds insufficient to justify the prolonged traffic stop. Thus, the physical evidence found in the backpacks is fruit of the poisonous tree and must be excluded under *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963).

Accordingly, **IT IS ORDERED** that the motions to suppress of Defendant Eric Jasper LeBeau (Doc. 29) and Luis Alberto Garcia (Doc. 32) are GRANTED. The evidence discovered during the search of LeBeau's and Garcia's backpacks on May 31, 2019 is excluded.

DATED this 2ⁿᵈ day of December, 2019.

Dana L. Christensen, Chief Judge
United States District Court